## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PHYLLIS PADILLA-OWENS,

      Plaintiff,

v.                                      No. CIV 02-0448 JB/WDS

SANDIA NATIONAL LABORATORIES,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Defendant's Motion for Summary Judgment. The primary issues are whether the plaintiff, Phyllis Padilla-Owens ("Padilla-Owens"), has established the existence of a genuine issue of material fact on the causal connection element of her prima facie case of unlawful retaliation and whether she has demonstrated that Sandia National Laboratories'[1] proffered reasons for failure to promote are a pretext for discrimination.  Because the Court finds that Padilla-Owens fails to create a factual issue as to the casual connection element and has also not demonstrated that all the reasons Sandia offers for not promoting her are a pretext for retaliation, the Court grants Sandia's motion.

## UNDISPUTED FACTS

While both parties have presented many facts, through completed briefing and oral argument, many are not material.  Because this case now involves only a retaliation claim, much of the parties' discussion of pre-retaliation discrimination is not material to this motion.  Cf. <u>Mass v. Martin Marietta</u>

---

[1]Defendant Sandia National Laboratories' correct name is Sandia Corporation ("Sandia").

<u>Corp.</u>, 805 F. Supp. 1530, 1541 (D. Colo. 1992)(holding that a retaliation claim was not reasonably related to a discrimination claim where plaintiff sought to base his retaliation claim on acts that had occurred before he filed his charge with the EEOC).

Sandia has employed Padilla-Owens in the Corporate Training and Education Department ("CTD") for the past approximately seventeen years. <u>See</u> Complaint ¶ 9, at 2; Answer ¶ 7, at 2. She is a current employee. In February of 2000, Padilla-Owens went to Sandia's internal Equal Employment Office ("EEO") and registered a complaint that Sandia was discriminating against her on the basis of her national origin. <u>See</u> Complaint ¶ 15, at 3; Answer ¶ 9, at 2. Specifically, Padilla-Owens complained that her supervisor, Charline Wells ("Wells"), was discriminating against her by refusing her promotional opportunities. <u>See</u> Complaint ¶15, at 3; Answer ¶ 9, at 2.

On March 23, 2001, Padilla-Owens filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Sandia had retaliated against her -- <u>after</u> she filed the complaint of ethnic discrimination with Sandia's EEO -- in that, among other things, Sandia denied her promotions and advancement opportunities routinely provided to other Sandia employees. <u>See</u> Complaint ¶ 4, at 1; Answer ¶ 4, at 1.

Wells is the CTD manager and was the immediate supervisor of Padilla-Owens until May of 2002. <u>See</u> Padilla-Owens Depo. at 13-14. Padilla-Owens had a history of steady promotions--four in nine years--before Wells became her supervisor. <u>See</u> Wells Depo. at 85-88. Wells did not promote Padilla-Owens during the five-and-one-half years she supervised Padilla-Owens. <u>See id.</u> at 84. Wells promoted every employee she supervised during the five-and-one-half year period in Business Leadership and Development except Padilla-Owens. <u>See id.</u> at 84-85. Since 1997, Padilla continually expressed her wish that Sandia promote her from a Member of Laboratory Staff ("MLS") to a Senior

2

MLS ("SMLS") except in February, 2000, when she expressed an apparent withdrawal of her desire to be an SMLS.  See id. at 108-109; e-mail from Padilla-Owens to Wells (Feb. 9, 2000).  As Manager in Business Leadership and Development at Sandia, Wells oversaw the work that employees performed, including assigning the work employees performed and approving the projects on which employees worked.  See Wells Depo. at 11-12.  If any employee worked on a project during the time that Wells was program manager in Business and Leadership Development, it was because Wells had approved his or her working on the project.  See id.

Padilla-Owens' job in CTD has been as an MLS.  An MLS's function is to review and contract for training courses, to provide training, to organize training events, and to determine training needs for Sandia managers who are CTD's "customers."  Padilla-Owens Depo. at 11-12. As an MLS, Padilla-Owens' duties included developing, implementing, monitoring, and operating "in-house" programs for optimal use and development of personnel.  See Occupation Description, 0117 Training & Development.  Padilla-Owens performed all the job duties that Wells assigned her in at least a satisfactory manner.  See Wells Depo. at 59-60.  Wells does not remember any customer giving Padilla-Owens negative feedback with respect to how Padilla-Owens performed her job duties. See Wells Depo. at 123.

Padilla-Owens discussed her desire to be classified as an SMLS with Wells in 1997.  See Padilla-Owens Depo. at 25-27; Memorandum from Wells to file (Dec. 8, 1997)(regarding November 25, 1997 meeting); Affidavit of Charline Wells ¶ 2, at 1 (executed June 4, 2003).  At some point, Wells pulled a chart on the computer showing the requirements of a SMLS level employee.  See Padilla-Owens Depo. at 37.  Wells and Padilla-Owens then reviewed the chart.  See id.

Padilla-Owens talked to Wells again in late 1999 regarding her MLS classification.  See

Padilla-Owens Depo. at 46-48.  In December 1999, Wells stated to Padilla-Owens that she needed to shift her focus away from conference planning activities if she wanted to advance to a SMLS classification.  See Wells Depo. at 32.  Wells did not, however, tell any of her supervisors that she preferred that Padilla-Owens not be assigned conference planning activities.  See Wells Depo. at 57-58.  Padilla-Owens did not tell Wells that she wanted to focus on conference planning activities.  See Wells Depo. at 34.  Wells acknowledged in her testimony that, if Padilla-Owens accepted work on a conference, it was at one of her supervisors' request.  See id. at 40.

As of January 2000, Padilla-Owens was dissatisfied with Wells' failure to advance her to an SMLS position  See  Padilla-Owens' Depo. at 61, 68-69; memorandum from Padilla-Owens (dated Jan. 20, 2000).

Wells testified that, before she attended a mediation on Padilla-Owens' EEOC claim in July 2001, she had a complete understanding of the Integrated Job Structure ("IJS"), how the IJS applied to Padilla-Owens, and what Owens was doing in the workplace at the time.  See Wells Depo. at 29. It is Wells' opinion that Padilla-Owens focused on and  spent the majority of her work time in 1999 and 2000 working on conference planning activities.  See Wells Depo. at 32-33.  Sandia represented to the EEOC that Padilla-Owens persisted in her focus on conference planning activities at the expense of developing the knowledge and skills needed for advancement to SMLS.  See Wells Depo. at 58.  Wells agrees that this statement in Sandia's EEOC Position Statement is true.  See Wells Depo. at 58.

Sandia used Performance Management Forms ("PMFs") to evaluate an employee's job performance and activities.  See Wells Depo. at 42. Wells testified that she based her opinion that Padilla-Owens spent a majority of her work time on conference planning activities on PMFs.  See id.

at 42.    Wells  testified that Padilla-Owens spent the large part of her time in 2000 on conference planning activities, but did not know whether she spent the large part of her time on conference planning activities in 2001.  <u>See id.</u> at 50.  Wells does not believe that Padilla-Owens spent the large part of her time on conference planning activities in 2002.  <u>See id.</u> at 50.   Padilla-Owens' PMFs for 2000, 2001, and 2002, however, show that Owens did not spend a majority or large part of her time in conference planning activities.  <u>See</u> PMFs for 2000, 2001, and 2002.  Indeed, Wells admits that Owens' 2000 PMF shows that Owens' conference planning activities were at a minimum.  <u>See</u> Wells Depo. at 127.  In her deposition, Wells was unable to give a percentage or range of percentage of time that Owens spent on conference planning activities in 1999 and 2000.  <u>See id.</u> at 33.

Wells testified that, with respect to achieving a SMLS level through the FY2000 PMF, Padilla-Owens did not develop criteria for evaluating effectiveness of training activities.  <u>See</u> Wells Depo. at 129-130, 138-139.  Padilla-Owens' FY2000 PMF, however, states that Padilla-Owens completed a curriculum evaluation of the Customer Satisfaction Training program, analyzed survey data, and evaluated areas of Human resources as a member of the HR Customer Satisfaction Committee.  <u>See</u> 2000 PMF.  At her deposition, Wells did not recognize that Owens had done evaluation effectiveness activities on the FY2000 PMF.  <u>See</u> Wells Depo. at 131-33.  Wells does not know whether Padilla-Owens developed criteria for evaluating the effectiveness of the Interviewing Skills for Managers program.  <u>See id.</u> at 139.  Padilla-Owens' 2002 PMF, however, which Wells signed, states that Padilla-Owens "updated course hand-outs and reviewed evaluative data . . . ." 2002 PMF.

Wells admits that Owens has performed development, implementation, monitoring, operation of in-house programs, and review of vendor courses, as described in the Occupation Description for

0117.  See Wells Depo. at 137.  "Design" is not mentioned in the Occupation Description for 0117.
See id. at 44.  Nevertheless, Wells considered it a requirement that an employee do "design" work
to merit a promotion.  See id. at 183-184.  Indeed, Wells would not recommend an employee for
promotion up the IJS ladder unless the employee met all the level criteria.  See id. at 162-63.  And
Wells also told another MLS, Brewer, that she should perform design work to become an SMLS.
See id. at 184, lines 24-25, to page 185, lines 1-25.

The PMFs indicate that Padilla-Owens performed "design" work on the Customer Satisfaction
Training Curriculum, Partnering for Sandia Success classes, the CTD Annual Report, and
Interviewing Skills for Managers and Technical Leaders class.  See 2000 and 2001 PMFs for Padilla-
Owens.  Wells signed the PMFs.  See id. Padilla-Owens, however, created much of the PMFs'
content.  See "Following the Process: Filling Out the PMF Form 7/1/00-6/30/01."   At her deposition,
Wells did not recognize that Padilla-Owens did a course design update.  See Wells Depo. at 127-28.
Wells did not know to what the course design update on Owens' FY 2000 PMF refers.  See id. at
128-129.

For an employee to move from MLS to SMLS, the employee needs to fulfill all the job
descriptions listed on the IJS movement guidelines.  See id. at 168.  As an "on-roll" laboratory staff
employee, Padilla-Owens needed to meet only the level criteria to be promoted.  See id. at 179.
With respect to the movement guidelines and the job activities listed on the IJS documents, an MLS
employee would need to fulfill the following before Sandia will promote the employee to SMLS: (i)
work independently on assignments that support organizational/Laboratories projects, programs, and
business operations; (ii) develop solutions to specific problems related to issues of moderate scope,
complexity, and impact with either internal or external customers; (iii) make recommendations to

6

management related to management policies and general business operations and activities; (iv) frequently recommend changes to methods, processes and occasionally lead teams and participate in planning, conducting, and reporting on a frequent basis; (v) have a complete professional understanding in an area of specialized applicable knowledge, or broad professional understanding in interdisciplinary areas of applicable knowledge; (vi) perform work with minimal direction; (vii) use judgment in following standard policies, procedures, and practices; (viii) exercise considerable latitude in determining objectives and approaches to assignments; (ix) provide some review of project directions, approaches, and performance objectives; (x) display independence in supporting and completing long-term projects or business operations that coordinate with work of others; (xi) have responsibility for contacts where the level of usual contact is with immediate management, peers, and peers' immediate management, both internal and external; (xii) consult with internal or external peers or immediate management; (xiii) frequently make proposals or represent organization on cross-disciplinary teams; (xiv) occasionally consult with senior management and peers, both internal and external; (xv) exert some influence on overall objectives and long-range goals of organization; (xvi) exercise decision-making within parameters established for day-to-day operations; and (xvii) within organizational parameters, employees at this level [SMLS] occasionally have some decision-making authority related to cost, schedule, and performance.  See Wells Depo.  at 168-178.

With respect to the above criteria for movement to SMLS, Wells testified that Padilla-Owens met, at least in part, all the written criteria except: (i) Criterion # 3: makes recommendations to management related to management policies and general business operations and activities, see Wells Depo. at 169; (ii) Criterion # 5: has a complete professional understanding in an area of specialized applicable knowledge, or broad professional understanding in interdisciplinary areas of applicable

knowledge, see id.; (iii) Criterion # 15: exerts some influence on overall objectives and long-range goals of the organization, see id. at 175; and (iv) Criterion #16: exercises decision-making within parameters established for day-to-day operations, see id.  Additionally, Wells' testimony reveals that Padilla-Owens only partially met some of the other IJS written criteria: (i) Criterion #2: develops solutions to specific problems related to issues of moderate scope, complexity, and impact with either internal or external customers; (ii) Criterion #6: work is performed with minimal directions; (iii) Criterion #10: displays independence in supporting and completing long-term projects or business operations with coordinate with work of others; and (iv) Criterion #17: within organizational parameters, employees at this level [SLMS] occasionally have some decision-making authority related to cost, schedule and performance.  See Wells Depo. at 168-178.  Sandia's written IJS movement guidelines require that an employer consistently meet all criteria to move up the MLS ladder.  See id. at 163-164 (discussing the IJS written criteria).

With respect to "makes recommendations to management related to management policies and general business operations" (Criterion #3), the FY 2000 PMF indicates that Padilla-Owens accomplished the following: (i) determined appropriateness of speakers for the Management Breakfast Series[2]; (ii) represented CTD on the HR "Workplace Improvement Team," which made recommendations to management pertaining to a resolution of workplace issues and problems; and (iii) worked with instructors' organizations, internal customers and Sandia contracts/purchasing related to the transition to Oracle.  See 2000 PMF; Wells Depo. at 177.  Padilla-Owens' 2001 PMF indicates that she represented CTD on the HR Customer Satisfaction Committee and made

_____

[2] Wells does not consider the Breakfast Series a conference planning activity.  See Wells Depo. at 33.

recommendations regarding speakers and topics for the Breakfast Series.  See 2001 PMF.  The HR Customer Satisfaction Committee's duties included making recommendations to management for improvement in Sandia's HR services.  See id.  Finally, Padilla-Owens' 2002 PMF states that she served as the Editor of CTD Annual Report, made recommendations for changes to the Annual Report, and made recommendations to management for modifications in the production process of the Annual Report.   See 2002 PMF.   Also in 2002, Padilla Owens continued to make recommendations to management for speakers in the Breakfast Series, continued to make recommendations through her participation on the HR Customer Satisfaction Committee, served as consultant to the Vehicle Systems Department with respect to job interviewing, and interfaced with all levels of Sandia management to manage, implement, and evaluate the Balanced Scorecard training events.  See id.

With respect to having a "complete professional understanding in an area of specialized applicable knowledge or broad professional understanding in interdisciplinary areas of applicable knowledge" and in the area of "specialized applicable knowledge" (Criterion #5), in Padilla-Owens' 2000 PMF, Sandia recognized  Padilla-Owens as CTD's expert in the area of implementation of training events such as Breakfast Series and conferences and CTD's expert in delivering training to managers on the topic of interviewing skills.  See 2000 PMF.  Padilla-Owens also became CTD's resident expert with respect to teaching and consulting line management on interviewing skills.  See 2002 PMF; 2001 PMF.   In the area of "broad professional understanding," Owens designed, evaluated, and managed the Breakfast Series and follow-up workshops, delivered different types of management training to staff (Interviewing Skills, Partnering for Sandia Success, Managing Professional Growth, and others), administered courses in the Business Development Program,

served on a number of inter-disciplinary training and work improvement teams as CTD representative, and instructed in various courses related to management training. <u>See</u> 2002, 2001, 2000, and 1999 PMFs.

With respect to "exerts some influence on overall objectives and long-range goals of organization" (Criterion #15), Padilla-Owens, among other duties, selected speakers and topics for the Breakfast Series, made recommendations for changes with CTD based on the customer feedback survey from the HR Customer Satisfaction Survey, served as Editor of the CTD Annual Report, acted as Trainer/Facilitator for management development courses such as Partnering for Sandia Success, served on the HR Workplace Improvement Team, consulted with and advised Sandia line management in training, and managed courses in the Business Development Curriculum. <u>See</u> Wells Depo. at 177; 1999, 2000, and 2001 PMFs.

Padilla-Owens believed that her classification, salary level, and workload were the result of Hispanic discrimination and contacted Sandia's internal EEO on February 7, 2000 to make a complaint. <u>See</u> Padilla-Owens Depo. at 61-62; e-mail from Padilla-Owens to Margaret Harvey and Diane Nakos (dated February 7, 2000). On February 9, 2000, two days after Padilla-Owens contacted Sandia's internal EEO, Padilla-Owens met with Wells and complained that Wells kept changing the rule on how to become an SMLS. <u>See</u> Padilla-Owens Depo. at 106-110. Padilla-Owens told Wells that she no longer wanted to be considered for advancement to SMLS and that she wanted to continue to do course administration of the Business School Curriculum. <u>See id.</u>; e-mail from Padilla-Owens to Wells (dated Feb. 9, 2000).[3]

---

[3] Although Padilla-Owens' e-mail stated that she no longer wished to be considered for a promotion to SMLS, Wells continued to believe that Padilla-Owens was interested in the promotion to SMLS. <u>See</u> Wells Depo. at 201-202.

Padilla-Owens met with the EEO representative, Diane Nakos, on February 14, 2000.   See Padilla-Owens Depo. at 61-62.  Padilla-Owens filed her complaint that same day.  See Wells Depo. at 58.  Padilla-Owens' complaint to EEO was that Wells changed the reasons why she was not advanced to an SMLS level.  See Padilla-Owens Depo. at 63.  Padilla-Owens alleged that the "new" reasons were that she was doing conferences, was not teaching at least one class,  or that she was doing too much administrative work as opposed to instructional design.  See id.  Padilla-Owens does not believe that training skills are different from conference skills.  See id. at 64.  Padilla-Owens' internal EEO complaint was primarily against Wells.  See id. at 75-76.  Padilla-Owens had been dissatisfied with her failure to advance as an MLS and with her workload volume for approximately two years.  See id.

Following the filing of Padilla-Owens' complaint, Wells decided to help Padilla-Owens to avoid a tendency to perform nonprofessional level work.  See Wells Depo. at 55.  In 2000 and 2001 and following a February 2000 meeting with Don Blanton, Wells made efforts to move Padilla-Owens into SMLS work, move her away from conference planning activities, and participate in interdisciplinary teams so she could achieve a SMLS level.  See id. at 201-202.

In May 2000, Wells was planning to give Padilla-Owens new work assignments in the training and design of interviewing skills, customer satisfaction training curriculum, and instructional design. See id. at 91-92.  Padilla-Owens considered these assignments to be SMLS level work.  See id. Padilla-Owens performed these assignments.  See id.

At a meeting on July 11, 2000 between Padilla-Owens and Nakos to discuss the conclusions of Sandia's internal EEO investigation, Padilla-Owens complained that Wells was retaliating against her by not responding to her e-mails, was not acknowledging her, and continued not to promote her.

11

See id. at 100-104; handwritten note on e-mail from Nakos to Padilla-Owens (dated June 14, 2001).

Wells is the only person who Padilla-Owens alleges retaliated against her for filing an internal EEO complaint.  See id. at 166.  Padilla-Owens filed a charge with the EEOC for retaliation on March 23, 2001.  See id. at 167.  Padilla-Owens alleged to the EEOC that Wells retaliated against her by failing to promote her to the SMLS level.  See id. at 136-137, 170; memorandum from Wells to Padilla-Owens (undated); memorandum to Wells from Padilla-Owens (undated); Affidavit of Padilla-Owens to the EEOC.  Padilla-Owens told the EEOC that Wells allowed other employees to attend professional development training while she was not.  See Padilla-Owens at 171; Affidavit of Padilla-Owens to the EEOC.

## STANDARD FOR SUMMARY JUDGMENT MOTIONS

The Court should enter summary judgment only when the evidence of record demonstrates the absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Woodman v. Runyon, 132 F.3d 1330, 1337 (10th Cir. 1997).  The nonmovant is afforded a "'wide berth to prove a factual controversy exists.'"  Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998)(quoting Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir. 1995)).  The Court's task on a motion for summary judgment is to determine whether a sufficient disagreement exists to require submission to a jury.  See Bingaman v. Kansas City Power & Light Co., 1 F.3d 976, 980 (10th Cir. 1990).

In determining whether a sufficient disagreement exists with respect to a genuine issue of material fact, the Court should interpret all reasonable inferences in the light most favorable to the nonmoving party.  See Jeffries v. Kansas, 147 F.3d at 1228 (internal citations omitted).  In the specific context of Title VII employment cases, summary judgment motions do not have the purpose

of having the Court conduct a "mini trial" to determine the employer's true state of mind.  Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995).  Where the plaintiff has met her prima facie burden and presented evidence of pretext, from which a trier of fact could infer discriminatory motive, the case should go to trial.  See id.  Judgments about intent are best left for the trier of fact and are within the jury's province.  See id.

The sole claim before the Court on Defendant's Motion for Summary Judgment is Padilla-Owens' claim for Title VII retaliation based on a failure to promote; there is no claim before the Court for discrimination.  See Complaint for Damages from Retaliation ("Complaint").

## RETALIATION CLAIM

Padilla-Owens alleges that Sandia retaliated against her after she filed a complaint of ethnic discrimination with Sandia's EEO.[4]  Padilla-Owens' Complaint for Title VII retaliation alleges that she suffered adverse employment actions in the failure to promote her, the refusal of her professional development, diminished job evaluations, and discriminatory treatment in the terms and conditions of her employment.  However, while Sandia moves for summary judgment on all claims and allegations, Padilla-Owens only attempts to resist on one issue: retaliatory failure to promote.  See Response at 16.

Under the local rules of this Court, if a nonmovant fails to contradict material facts raised in a motion for summary judgment, those facts are deemed admitted.  See D.N.M. LR-CV 56.1(b).  Padilla-Owens did not respond to Sandia's motion with regard to any of the claims and allegations other than the claim for retaliatory failure to promote.  At the hearing on this motion, the Court

---

[4] While the Plaintiff also alleged retaliation after she filed her EEOC complaint, at the hearing on her motion, the Plaintiffs counsel conceded that the only relevant protected activity was her filing of the EEO complaint.  See Transcript of Hearing at 22, lines 4-11.

noted that Padilla-Owens only disputed the retaliatory failure to promote claim and that rendering a decision on that claim would be dispositive of the entire case.   Neither party contested this characterization of the motion.   The Court considers all claims but the retaliation claim withdrawn.

In its moving papers, Sandia devotes attention to three claims for retaliation that Padilla-Owens does not defend: (i) an evaluation rating that was lower in 2000 than it had been in 1999, before Padilla-Owens made her complaints to Sandia's internal EEO office; (ii) Wells' refusal to allow Padilla-Owens to attend professional development courses; and (iii) the creation of a hostile work environment.   Owens does not press these claims in responding to Sandia's motion for summary judgment.   See Response at 16.   Hence, the one outstanding claim which Padilla-Owens contends requires the decision of the fact-finder is her failure to promote claim.

Section 2000e-3(a) of Title 42 makes it unlawful to retaliate against an individual because she has opposed any practice that Title VII makes unlawful:   "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any employment practice by [Title VII], or because he has made a charge . . .  under [Title VII]."   42 U.S.C. §2000 e-3(a).   Accordingly, Title VII prohibits employers from retaliating against employees who claim discrimination.   See Pastram v. K'Mart, 210 F.3d 1201, 1205 (10th Cir. 2000).   The United States Court of Appeals for the Tenth Circuit has applied the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), to claims of Title VII retaliation. Under this burden-shifting analysis, a plaintiff must first establish a prima facie case of unlawful retaliation.   To establish a prima facie case of unlawful retaliation, a plaintiff must show three elements: (i) engagement in protected opposition to discrimination; (ii) an adverse action by the employer subsequent to or contemporaneously with such activity; and (iii) a causal connection

14

between such activity and the employer's adverse actions.  See, e.g., Peterson v. Utah Dept. of Corrections, 301, F.3d 1182, 1188 (10th Cir. 2002); O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).

In the summary judgment context, a plaintiff must demonstrate a genuine issue of material fact for each element of her prima facie case for retaliation.  See McCue v. State of Kan., Dep't of Human Res., 165 F.3d 784, 788 (10th Cir. 1999).  Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a facially legitimate nondiscriminatory rationale for the adverse action.  See Robbins v. Jefferson County Sch. Dist. R-1, 186 F.3d 1253, 1259 (10th Cir. 1999), overruled on other grounds by Boger v. Cordent Technologies, 316 F.3d 1137 (10th Cir. 2003).  If the employer meets its burden of articulating a facially legitimate nondiscriminatory rationale for the adverse action, the burden shifts again to the plaintiff to demonstrate that the defendant's offered reasons are mere pretext for discrimination.  See id.  In other words, the plaintiff must demonstrate that the rationale is "unworthy of belief."  Id.

## I. PADILLA-OWENS CANNOT MEET HER BURDEN TO ESTABLISH THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO A CAUSAL CONNECTION BETWEEN HER EEO COMPLAINT AND SANDIA'S FAILURE TO PROMOTE.

Sandia does not dispute that Padilla-Owens engaged in protected opposition to discrimination by using Sandia's internal grievance procedures.  See Transcript of Hearing at 5, lines 5-8 (August 19, 2003).  As noted above, Padilla-Owens has conceded that the only "adverse employment action" at issue is Sandia's failure to promote to SMLS.  And Sandia does not dispute that the failure to promote based upon unlawful retaliation constitutes an adverse employment action.  See id. at 5, lines 17-19.

To meet the third prong of a prima facie case of retaliation under Title VII, a plaintiff must prove that the employer's adverse employment action against her was causally connected to protected opposition of discriminatory practices.  See Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993). There are two ways a plaintiff can satisfy this element.  First, the plaintiff can prove causation by direct evidence.  Second, she can prove causation by close temporal proximity between the protected activity and the adverse employment action.

To establish a causal connection between that activity and the adverse employment action, and thus a prima facie case of Title VII retaliation, the adverse action must closely follow the protected activity.  See Candelaria v. EG&G Energy Measurements, Inc., 33 F.3d 1259, 1261 (10th Cir. 1994). "The date of [the adverse action] is key to this inquiry because the closer it occurred to the protected activity, the more likely it will support a showing of causation."  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).  "[U]nless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." Anderson v. Coors Brewing Co., 181 F.3d at 1179 (noting that a one and one half month period by itself may establish causation, while a three month period may not).  See Adams v. Washburn University of Topeka, 66 Fed. Appx. 819, 2003 WL 21290924 (10th Cir. 2003); Conner v. Schnuck, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997).

According to the Tenth Circuit, a lapse of three months or more between protected activity and adverse action is too long a period to allow an inference of causation without the "additional evidence."  See Anderson v. Coors Brewing Co., 181 F.3d at 1179;  Duran v. State of New Mexico Dept. of Labor, 143 F. Supp. 2d 1278, 1284 (D.N.M.)(citing Richard v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(affirming district court holding that three-month period, standing alone, is

insufficient to establish causation)), aff'd, 26 Fed. Appx. 880, 2002 WL 120527 (10th Cir. 2002)).

As the Honorable Harris L. Hartz, Circuit Judge, stated in Wells v. Colorado Dep't of Transp., 325

F.3d 1205 (10th Cir. 2002), "[a] five-month gap between a protected activity and an adverse action

would ordinarily be too great a time lapse to support an inference of causation based on timing

alone." Id. at 1217.[5]

Padilla-Owens argument is not that Sandia retaliated against her during the entire time that

Wells supervised her, but, rather, that following the EEO complaint, during the period of time that

she was performing activities that she had not been performing before the filing, she performed them

in a satisfactory manner.  Wells had indicated that these new tasks were needed to merit a SMLS

promotion.  Nonetheless, Wells did not promote her.

More specifically, Padilla-Owens argues that the evidence in this matter is that she performed

in a satisfactory manner those job duties and assignments that Wells requested following the filing of

the EEO complaint and yet Wells did not promote her.  Those same activities that permitted other

employees to rise to SMLS did not serve Padilla-Owens in her quest for the promotion.  It is this

evidence that Padilla-Owens maintains establishes a causal connection between the protected activity

---

[5] Some plaintiffs are unable to show causation between the protected activity and the employment action through any means.  See, e.g., Stutler v. Illinois Dep't of Corr., 263 F.3d 698, 704 (7th Cir. 2001)(affirming entry of summary judgment for defendant and concluding that collapse of friendship between the plaintiff and her supervisor, which led to tension and transfer of plaintiff, was not retaliation); Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 254 F.3d 644, 653-54 (7th. Cir. 2001)(affirming entry of summary judgment for defendant and holding that promotion denial was not evidence of causal connection and actions immediately after the protected activity -- changing plaintiff's schedule, reprimanding her for violations which other employees committed without adverse consequences, encouraging her to "spend more time" with an officer who had made advances towards the plaintiff -- were nonmaterial); Lowe v. WCAU-T.V., 1979 WL 104 at *5 (E.D. Pa. July 16, 1979)(finding the plaintiff's discharge was not in retaliation for filing Title VII suit -- even though discharge occurred within two days of employer receiving suit -- where plaintiff was discharged for twice refusing supervisor's orders), aff'd 692 F.2d 749 (3d Cir. 1982).

17

and the adverse employment action.  Padilla-Owens contends that these facts speak of a motive, driven by Wells' retaliatory animus, based on the filing of the EEO complaint, to deny her promotion despite her completion of all the level criteria in the IJS structures for a SMLS classification.

At oral argument, Padilla-Owens' counsel clarified that she did not consider herself qualified for a promotion to SMLS until July 11, 2000, a full five months after she first contacted the EEO to file a complaint on February 7, 2000.  See Transcript of Hearing at 33, line 24 to 34, line 5.  She also contends that she first suffered the retaliatory failure to promote on July 11, 2000.  See Transcript of Hearing at 20, line 13 to 21, line 1.  Accordingly, Padilla-Owens is not relying on temporal proximity alone to establish causation.  Padilla-Owens conceded the same at oral argument.  See Transcript of Hearing at 21, line 7, to 22, line 3.

By declining to satisfy the casual connection element by inference from the proximity in time between the protected activity and the employer's action, Padilla-Owens must undertake the more difficult task of providing the Court with the "something more" the Tenth Circuit case law discusses. Padilla-Owens shows the protected act and the adverse employment action, but the record does not reasonably show anything else.  There is no evidence that Sandia's failure to promote Padilla-Owens to SMLS is linked to her protected activity.  She thus fails to show a genuine issue of material fact about the causal connection requirement.  Accordingly, Padilla-Owens has not tendered evidence sufficient to make a prima facie case of retaliation.

It is undisputed that Padilla-Owens wanted to be, and thought she was qualified to be, an SMLS before she made her complaint to the EEO.  Specifically, Padilla-Owens wanted to be an SMLS as early as November 1997.  Padilla-Owens discussed her desire to be promoted with Wells

again in 1999.  See Padilla-Owens Depo. at 46-48.  Wells disagreed with Padilla-Owens.  It is also

undisputed that Padilla-Owens wanted to be, and thought she was qualified to be, an SMLS after her

complaint to EEO.  She continues to want to be an SMLS.  Wells continues to disagree with her.

Padilla-Owens concedes that she was not qualified until July 2000 -- five months after she

filed the EEO complaint.  Padilla-Owens also indicated her continued interest in promotion to SMLS

in her 2001 and 2002 PMFs, well after the alleged retaliation on July 11, 2000.  See 2001, 2002

PMFs.  Hence, Sandia denied her a promotion to SMLS before and after the filing of her Filing 2000

EEO complaint.

The Tenth Circuit has considered what additional evidence may be sufficient to establish a

causal connection when the temporal proximity standing alone is insufficient.  In Richmond v.

ONEOK, Inc., the Tenth Circuit declined to find the "something more" where "there is no pattern

based on a single request for overtime pay . . . ."  120 F.3d at 209.  In Adams v. Washburn University

of Topeka, the Tenth Circuit also held that the employee failed to establish causal connection.  66

Fed. Appx. at 822-23.  The court then reviewed the "other evidence" to see if it suggested retaliatory

motive:

> Her evidence that Dr. Sheley was upset when she filed her complaint in 1994  is not
> evidence of causation.  Nor does Dr. Sheley's comment to Dr. Van Cleaf that he
> believed plaintiff would not want to continue in the position beyond her three-year
> lecturer position, on its face, indicate a discriminatory animus toward her.

Id. at 823.  The court stated "the fact that plaintiff may have been qualified for the position does not

support an inference of discrimination," id. (emphasis added), and that the "plaintiff's complaints

regarding the procedures used by the search committee do not support an inference of retaliation

because the committee applied the same standards and procedures when considering each applicant,"

id.  The court did, however, note that "[t]he evidence of Dr. Van Cleaf's 'attitude change' and the fact that he attended only the first committee meeting where plaintiff was eliminated as a candidate, coupled with other evidence, potentially could support an inference of retaliation."  Id.  The Tenth Circuit nevertheless did not think such slim evidence was enough to avoid summary judgment: "[P]laintiff failed to provide this court with additional evidence needed to support such an inference and '[t]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is "genuine.""" Id. at 823-24 (quoting Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997)).  The court then affirmed the District Court's grant of summary judgment.

In Selenke v. Medical Imaging of Colorado, 284 F.3d 1249 (10th Cir. 2001), the district court granted the employer's motion for summary judgment and the Tenth Circuit affirmed, stating that the employee failed to establish a causal connection between her complaints about inadequate ventilation in employer's darkroom and her probation.  See id. at 1265.  The court stated

> [Plaintiff's] argument is undermined by the lack of corroboration of her perception of her work performance.  She offered no evidence from other witnesses that she was performing her job adequately and that MIC's action was not justified.  As we have noted, "it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [her] own relative performance."  Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir. 1996).

Selenke v. Medical Imaging of Colorado, 248 F.3d at 1266.[6]

_____

[6] See Azzaro v. County of Allegheny, 110 F.3d 968, 873-75 (3d Cir. 1997)(noting that there may not have been direct evidence that two events were connected, but found indirect evidence to raise inference: (i) employer could determine who made the allegations; (ii) plaintiff's name was put on a "hit list": (iii) "reorganization" led to the elimination of the plaintiff's position, but many new hires; (iv) county had only once before eliminated a non-vacant position; and (v) plaintiff was not offered any positions even though she was qualified for many); Weaver v. Casa Gallards, Inc., 922 F.2d 1515, 1526 (11th Cir. 1991)(finding that actions included a marked increase in negative performance evaluations and a heightened scrutiny of the plaintiff's work).  Indeed, the most reliable

Given the opportunity to point to "other evidence" at the hearing before this Court on August 19, 2003, counsel for Padilla-Owens correctly asserted that temporal proximity is not the only way to establish a causal connection, but did not go further to provide the Court with the more evidence which would create a factual question as to a causal connection.  <u>See</u> Transcript of Hearing at 21, lines 21 to 40.  Padilla-Owens argues that the evidence shows that Wells did not "start to make a concerted effort to allegedly help Padilla-Owens to achieve the SMLS promotion until after Padilla-Owens filed her EEO complaint."  Response at 17.  There does appear to be a dispute about this assertion, but the only evidence that Padilla-Owens cites for this assertion is that: (i) Wells did not discuss with Blanton, her supervisor, the need to move Padilla-Owens toward work duties that would assist Padilla-Owens in rising to SMLS until after the EEO complaint had been filed; and (ii) Wells did not begin changing Padilla-Owens' job duties and assignments to a level more consistent with SMLS-level work until after Padilla-Owens filed her EEO complaint.  <u>See</u> Wells Depo. at 55.  In other words, although Padilla-Owens had made inquiries before filing her EEO complaint, it was not until after she filed her  EEO complaint that Wells addressed Padilla-Owens' concerns and began to assign and direct her in work that Wells considered to merit a SMLS certification.

Those actions do not raise an inference of retaliation.  Indeed, to the Court, they suggest the opposite.  More importantly, the Court does not believe a jury could reasonably infer retaliation from

---

objective evidence of such motivation is probably a showing that, although the disciplinary action was ostensibly based on some kind of misconduct, other (nonprotesting) employees guilty of similar misconduct were not subjected to equally severe treatment.  <u>See</u>, <u>e.g.</u>, <u>De Cintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 115 (2d Cir. 1987).  "Such 'other evidence' includes an employer's treatment of employees differently for the same misbehavior, responding to an employment situation in a way different from ordinary policy, or the employer's blatant reaction against the plaintiff's having engaged in protracted activities." L. Larson, <u>Employment Discrimination</u> §35.05, 35-27 to 35-29 (Matthew Bender 2d ed. 2003).

these facts.

For the purposes of this motion, the Court is obliged to assume that Padilla-Owens was performing work, following the filing of the EEO complaint, that she had not been performing before the filing. Padilla-Owens goes on to state that Padilla-Owens' PMFs and Wells' testimony show a "steady progression" away from conference planning work and an increase in instructional design work and teaching activities that Padilla-Owens had indicated she needed to perform to become a SMLS-land employee. See Response at 17 (citing 2000, 2001, 2002 PMFs). That is a possible inference, but any such "steady progression" does not give rise to an inference that Padilla-Owens was entitled to a promotion to SMLS five months after she went to EEO or ever. As discussed in detail below, while Padilla-Owens asserts that she completed "all of the level criteria" to become an SMLS, the record does not support that assertion. A plaintiff may show a causal connection by producing evidence of circumstances that justify an inference of retaliatory motive. See Kendrick v. Penske Transp. Servs., Inc., 220 F.2d 1220, 1224 (10th Cir. 2000). Given that Sandia is doing the same thing that it has always done -- not promote Padilla-Owens -- the Court cannot infer from the fact that she is doing new tasks that Sandia is retaliating against her for the EEO complaint. Owens has not satisfied this element of a prima facie case for retaliation.

While the evidence of new tasks and satisfactory completion of some is all that Padilla-Owens advances to show causal connection, the Tenth Circuit recently expanded the scope of evidence to which the district court should look to determine casual connection. Judge Hartz, in Wells v. Colorado Dep't of Transp., stated that the plaintiff could use evidence that the reason given for her termination was pretextual to support causal-connection: "When evidence indicates that an employer's proffered reason for taking an adverse action is false, a factfinder can decide that the

employer was lying to mask its true unlawful purpose." 325 F.3d at 1217-18.

> The causal-connection element of a prima facie retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity.  If the employee can show that the employer's proffered reason for taking adverse action is false, the factfinder could infer that the employer was lying to conceal its retaliatory motive.

Id. at 1218  Judge Hartz made it clear that he knew exactly what he was doing:  "We understand that by considering an employer's proffered reasons for taking adverse action in the causal-connection portion of the prima facie case, we are assessing pretext evidence that is typically considered in a later phase of the McDonnell Douglas analysis."  Id.  The Tenth Circuit agreed "with the Third Circuit that evidence of pretext can be useful in multiple stages of a Title VII retaliation claim" and quoted a lengthy passage from Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000)("We recognize that by acknowledging that evidence in the causal chain can include more than demonstrative acts of antagonism or acts actually reflecting animus, we may possibly conflate the test for causation under the prima facie case with that for pretext.").

Judge Hartz then looked at the reasons that the employer testified he took the adverse action. The employee offered evidence that conflicted with the employer's rationale.  The court stated: "She has evidence from which a rational factfinder could infer that her version is correct."  Wells v. Colorado Dep't of Transp., 325 F.3d at 1218.  The court said that it did not matter if the employer was under no legal duty to do something; if the employer did something legal in light of the circumstances, a legal action "could reasonably be viewed as retaliation." See id. at 1219.  "The issue is not what the personnel rules required Mr. Moston to do, but whether he treated her differently than he would have if she had not engaged in protected activity."  Id.

**II.     EVIDENCE OF PRETEXT THAT CAN BE USED FOR CAUSAL CONNECTION AND DETERMINATION OF PRETEXT.**

As noted earlier, in Padilla-Owens' response and concessions at oral argument, she was not qualified to be an SLMS when she went to EEO, and she became qualified only at some point thereafter.  Under the pre-Wells tests for establishing the causal connection element, Padilla-Owens has not met her burden to demonstrate that there is any temporal proximity between the protected conduct and Wells failure to promote her when she allegedly became qualified at some point five months later.  Padilla-Owens, in her Response and at oral argument, does not offer the further evidence from which a court and jury can reasonably infer retaliation when temporal proximity is absent.  And when the Court looks at her arguments on pretext, the Court is also satisfied that she has not met her burden to demonstrate that there is any causal connection to meet the third prong of a prima facie case.

**A.     PADILLA-OWENS MAY HAVE RAISED AN ISSUE WHETHER ALL THE SPECIFIC REASONS WELLS GAVE HER FOR FAILURE TO PROMOTE WERE ACCURATE.**

Padilla-Owens contends that there is evidence in this case that raises issues of genuine fact whether Sandia's stated reason for not promoting Padilla-Owens is false.  Padilla-Owens and Sandia agree that Sandia's stated reason for not promoting Padilla-Owens to the SMLS classification is that she did not meet the requirements of the SMLS classification.  The dispute is whether that one reason is false.

There is no dispute that the reason Wells did not promote Padilla-Owens is because Wells did not consider her qualified.  Wells had a number of specific reasons that she did not consider Padilla-Owens qualified.  On some of those specific reasons, Padilla-Owens may have raised an issue whether

that specific reason was accurate.

Padilla-Owens argues that at least some of Sandia's stated, specific reason for not promoting her were false.   For example, following the filing of the EEO complaint, Wells decided, after discussing the matter with her supervisor, Don Blanton, to make a concerted effort to involve Padilla-Owens in job duties that merited the SMLS level.  Within months of the filing of the EEO complaint, Wells began to assign Padilla-Owens work that included teaching duties and instructional design -- the two areas that Wells had stated before the EEO complaint Padilla-Owens was lacking to achieve the SMLS classification.  These new duties are shown in the PMFs for 2000, 2001, and 2002.  Wells' testimony confirmed that these new duties are shown in the PMFs.  Wells also has asserted that she could not promote Padilla-Owens to SMLS because she chose to focus on conference planning activities.  Sandia's Position Statement to the EEOC echoes this sentiment.  As noted above, Padilla-Owens' PMFs undercuts this assertion.  Padilla-Owens has, thus, established an inconsistency with one of Sandia's proffered specific reasons for her non-promotion.

There is evidence in the record, some of which is undisputed, that Padilla-Owens performed only those job duties that Wells assigned to her.  Wells told Padilla-Owens that she needed to shift her focus away from conference planning activities to achieve a SMLS level.  Padilla-Owens did not tell Wells that she wanted to do conference planning activities and only worked on a conference at a supervisor's request.   The PMFs for 1999, 2000, 2001, and 2002 show that Padilla-Owens performed minimum conference planning activities.[7]  Padilla-Owens performed the job duties that her

---

[7] The FY 1999 PMF shows that Padilla-Owens worked on one conference; the FY 2000 PMF shows that she worked on one conference; the FY 2001 PMF shows that she worked on one conference; and the FY 2002 PMF shows that she worked on no conferences.  See PMFs for FY 1999-2002.

supervisor assigned and nothing more.   When Padilla-Owens performed conference planning activities, Wells or another supervisor requested she do so.   Padilla-Owens moved away from conference planning activities when Wells gave her an opportunity to do so.

Padilla-Owens contends that it is disingenuous for Wells to say that Padilla-Owens focused on conference planning activities when it was Wells and other supervisors assigning those activities. The PMFs show that Padilla-Owens' conference planning activities waned during the period following the filing of her EEO complaint until no such activity appeared on a PMF by 2001.  Wells concedes that, by FY 2002, Padilla-Owens did not spend a large time on conference planning activities.  Wells, who approved Padilla-Owens' performance evaluations, was unable to state at her deposition the amount or percentage of time that Padilla-Owens spent on conference planning activities.  Sandia's assertion that a "majority" or a "large part" of Padilla-Owens' time was spent on conference planning activities is inconsistent with the statements on her PMFs.

Padilla-Owens has thus shown that controversies exist with respect to facts regarding her claim of retaliation.  Factual disputes exist on the specific reason for which Sandia did not promote Padilla-Owens and refused her career development opportunities.  In addition, fact issues exist on the reasons for which Wells refused to recognize the job activities Padilla-Owens performed.  Extant PMFs, signed by Wells delineate those job activities.  The issue is whether these factual issues are material.

### B.    PADILLA-OWENS DOES NOT DISPUTE SOME OF THE SPECIFIC REASONS THAT PADILLA-OWENS WAS NOT QUALIFIED.

The problem for Padilla-Owens is that there are specific reasons that Padilla-Owens has not properly disputed. During her deposition, counsel for Padilla-Owens reviewed with Wells the specific

criteria listed in the IJS structure for an employee to advance to the SMLS level.  There are seventeen discrete criteria described in the IJS structure for advancement to SMLS.  While the parties dispute how many criteria Sandia contends were lacking, the evidence shows that there were at least four consistently lacking: (i) making recommendations to management related to management policies and general business operations and activities (Criterion # 3); (ii) having a complete professional understanding in an area of specialized applicable knowledge, or broad professional understanding in interdisciplinary areas of applicable knowledge (Criterion # 5); (iii) exerting some influence on overall objectives and long-range goals of the organization (Criterion # 15); and (iv) exercising daily decision-making within parameters established for day-to-day operations (Criterion #16).  There is also undisputed evidence that Wells believed Padilla-Owens only partially met criteria Nos. 2, 6, 10, and 17.

Padilla-Owens presents evidence that she believes shows she accomplished the tasks and requirements that Well contended she was lacking to meet the first three criteria, Criteria Nos. 3, 5, and 15.  There is evidence that Padilla-Owens made recommendations to management on policy and business operations through her involvement in the Breakfast Series, her representation of CTD on the HR "Workplace Improvement Team," her participation in the HR Customer Satisfaction Committee, her consulting work with time management, and her interface with all levels of Sandia management on the Balanced Scorecard.  Padilla-Owens' 1999, 2000, 2001 and 2002 PMFs, all signed by Wells, list all of these activities.  Padilla-Owens maintains that it is not worthy of belief that Wells would review these PMFs, assign Padilla-Owens these job tasks, approve her workplace activities, and then state that she did not perform these SMLS level activities.  Padilla-Owens contends that, when the observation on performance evaluations, to which Wells subscribes,

contradict and are inconsistent with Wells perceptions, Wells' perceptions raise an issue of material fact on pretext.

Wells also testified that Padilla-Owens did not merit the SMLS promotion because she did not have "a complete professional understanding in an area of specialized applicable knowledge or broad professional understanding in interdisciplinary areas of applicable knowledge." See Wells Depo. at 169, lines 18-24.  Padilla-Owens contends that this opinion is implausible in light of the PMFs compiled on her since she filed the EEO complaint.  She argues that she was universally recognized as CTD's expert with respect to the planning and implementation of training events, including the events related to the Breakfast Series, interviewing skills, and conferences.

On the side of "broad knowledge," Padilla-Owens contends that she performed all the specific tasks included on the Occupation Description for CTD, 0117.  These included development, implementation, operation, monitoring of programs for development of managers and staff.  There is no evidence that Padilla-Owens designed, evaluated, and managed the Breakfast Series, delivered different forms and topics of management training (including Interviewing Skills for managers, Partnering for Sandia's Success, and other programs), reviewed vendor courses, conducted classes, developed criteria for evaluating training activities, administered the courses and managed the curriculum of the Business Development Program, served on a number of interdisciplinary teams, and instructed on different courses.  Padilla-Owens had been in the Corporate Training Development and Education Department for a period of 17 years.  Padilla-Owens has pointed to some evidence that suggests a weakness in Sandia's contention that Padilla-Owens lacked broad-based knowledge in training and education, and there is thus evidence in the record that this specific reason is unworthy of belief.

28

Finally, Padilla-Owens contends that, through (i) her activities on interdisciplinary teams aimed at improving workplace satisfaction for both employees in the organization and internal and external customers; (ii) her selection of subjects and speakers for the Breakfast Series; (iii) her recommendations for changes in CTD based on the customer satisfaction surveys; (iv) her course design and management work on management courses associated with Interviewing Skills, the Balance Scorecard, and the Breakfast Series; (v) her consulting work with line management; and (vi) her long-standing involvement in facilitating and instructing on management topics, she exerted "some influence on overall objectives and long-range goals" of the CTD organization. Sandia does not dispute that these activities furthered, influenced, and enhanced CTD's goals. Given Wells' contention that Padilla-Owens has not satisfied this criterion, there is evidence in the record that Padilla-Owens fulfilled this SMLS criterion. Padilla-Owens maintains that Sandia cannot explain, unless a retaliatory motive underlies the result, how Wells could function as Padilla-Owens' supervisor and continually gloss over her accomplishments noted on PMFs that Wells signed.

Padilla-Owens maintains that it is false and disingenuous for Wells to now ignore the PMFs, the tasks she assigned Padilla-Owens to complete, and her background and experience in CTD in an effort to justify what must be retaliatory failures to promote. Padilla-Owens maintains that Wells has intentionally dismissed her workplace accomplishments to prevent her from achieving the SMLS advancement. There is evidence that Padilla-Owens has satisfied three criteria that Wells testified Padilla-Owens lacked.

While the Court must base its review of pretext on Wells' perception, the PMFs provide enough evidence to create an issue about the falsity of some of Sandia's posited specific reasons for contending that Padilla-Owens did not merit the SMLS promotion.

If Wells' perceptions were contradicted and inconsistent with the observations on performance evaluations that Wells signed, there might be a genuine issue of material fact about Wells' perception. But a careful examination of the deposition transcripts does not show that Wells thought Padilla-Owens met Criteria Nos. 3, 5, and 15.

Padilla-Owens relies largely on Wells' deposition testimony --and specifically on Padilla-Owens work with the Management Breakfast Series -- to establish that Padilla-Owens satisfied Criteria Nos. 3, 5, and 15. But Wells did not state that Padilla-Owens "consistently met these criterion." Rather, she said "Right. On that program, that's correct." Wells Depo. at 177, line 9. Accordingly, there is no evidence that Padilla-Owens consistently met these three criterion, which Sandia required she consistently met before by promotion.

While Criteria Nos. 3, 5, and 15 require some scrutiny of the deposition testimony, it is easier to see that Padilla-Owens does not raise a genuine issue of material fact about Criterion No.16. Padilla-Owens' only evidence to show she satisfies Criterion No. 16 is that she exercised some decision-making authority with regard to one event. See Wells Depo. at 175, line 15 to 178, line 9. She, again, did not offer evidence that she consistently met the criterion and did not assert or offer evidence that the decision-making she exercised actually met the criterion.

Nor has Padilla-Owens introduced any evidence to show that Sandia was wrong in concluding that Padilla-Owens only partially met criteria Nos. 2, 6, 10, and 17. Padilla-Owens has, therefore, failed to demonstrate that she consistently performed at the SMLS level in all criteria that the written IJS structure required for promotion before July 11, 2000. In sum, given Sandia's legitimate, undisputed business reasons for non-promotion -- failure to meet all written criteria for the job -- Padilla-Owens has failed to introduce more than a scintilla of "other evidence" to establish a causal

connection.  Sandia's failure to promote Padilla-Owens was based on at least one legitimate, non-pretextual business reason.  Padilla-Owens cannot show that, but for the retaliatory motive, she would have been promoted.  She has not presented evidence from which the Court can infer a genuine issue of material fact exists on pretext.

> **C.**    **THE PRICE WATERHOUSE MIXED MOTIVE TEST WOULD SUGGEST INCONSISTENCIES IN ONLY SOME REASONS IS INADEQUATE TO ESTABLISH CAUSAL CONNECTION.**

In the Civil Rights Act of 1991 ("CRA"), Congress addressed the situation in which the employment action taken against the plaintiff involves "mixed motives" -- that is, when the employer's decision is based in part on legitimate reasons and in part on illegal considerations.[8] Before the CRA changes, the dispositive case on this issue was Price Waterhouse v. Hopkins, 490 U.S. 228 (1089).  In Price Waterhouse, the Supreme Court held that, with regard to mixed motives, the employer may avoid liability by showing by a preponderance of the evidence that it would have made the same employment decision in the absence of a discriminating motivation.

Section 107 of the CRA changed this rule by providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was **a** motivating factor for any employment practice, even though other factors also motivated the practice."   Title VII, §703(m), 42 U.S.C. §2000e-2(m), as added by CRA of 1991, §107(a)(emphasis added).  The employer may thereafter establish that it would have made the same employment decision even if it had not been partly motivated by a discriminating reason, but such a

---

[8] Simply because more than one employer motive is at issue does not necessarily mean that the case is a "mixed motive" one.  If the dispute concerns whether a lawful or unlawful motive prompted the employer's decision, the issue is generally one of "pretext."  If the employer had both lawful and unlawful motives, the case is a mixed motive.  See Price Waterhouse v.Hopkins, 490 U.S. 228, 240 n. 6 (1989);  Foster v. University of Arkansas, 938 F.2d 111, 114 (8th Cir. 1991).

showing does not rebut the existence of a Title VII violation.  Instead, it has the effect of limiting available remedies.[9]

The legal issue is thus whether the "mixed motive" clause of the CRA applies to retaliation cases.  The section does not explicitly state that it applies to retaliation cases.  The mixed motive clause defines the conditions under which an "unlawful employment practice" is established.  See Title VII §703(m), 42 U.S.C. §2000e-2(m), as added by CRA of 1991, §107(a).  The anti-retaliation provision of Title VII appears under the specific heading of "[o]ther unlawful employment practices."

The EEOC has issued a notice concurring with the interpretation that § 2000e-2(m) applies to retaliation cases.  See EEOC Policy Guide on Compensatory and Punitive Damages under the 1991 Civil Rights Act, FEP Manual (BNA) 405: 6915 at 405: 6921, n.14 (July 7, 1992).  The EEOC has determined that the reference in §107 to "any employment practice" can only logically be interpreted to include retaliation as an "employment practice" and noted that nowhere in the CRA is there any expression of Congress' intent to exclude retaliation from the purview of §107.  Id.  At least one court has agreed with this analysis.  See De Llano v. North Dakota State Univ., 951 F. Supp. 168, 170 (D.N.D. 1997)(holding that the mixed-motive standard of the CRP applied to retaliation cases and stating that it would be "illogical and contrary to congressional intent" for the mixed-motive standards for retaliation claims to be different from those applied in discrimination claims).  See also Lewis v. American Foreign Serv. Ass'n., 846 F. Supp. 77, 80 (D.D.C.

---

[9]  The Honorable Stephanie K. Seymour applied "motivating factor" analysis to a retaliation case under the Fair Labor Standards Act.  There is a distinction between §2000e-2(m)'s "motivating factor" language and the Tenth Circuit use of the same language.  In the Tenth Circuit, the "motivating factor" test is the same as the "but for" test.  See Martin v. Gingerbread House, Inc., 977 F.2d 1405, 1408 n.4 (10th Cir. 1992)("Appellee argues the correct standard is a "but for" test: the discharge is unlawful only if it would not have occurred *but for* the retaliatory intent.  We believe the "but for" and "motivating factor"tests are equivalent.").

1993)(holding that the language of the CRA of 1991 is applicable to retaliation claims brought under §1981).

The United States Court of Appeals for the Seventh Circuit has rejected the EEOC's interpretation.  In McNutt v. Board of Trustees of the Univ. of Ill., 141 F.3d 706 (7th Cir. 1998), the United States Court of Appeals for the Seventh Circuit held that retaliation claims are not explicitly included in 42 U.S.C. §2000e-2(m), the CRA's mixed motive clause; hence, the clause does not apply to those claims.  Although the court acknowledged that retaliation is defined as an "unlawful unemployment practice," this could not overcome the fact that the section allowing injunctive relief, attorney's fees, and costs to prevailing plaintiffs in mixed motive cases allows for such relief only for violations of section 2000e-2(m).  See 42 U.S.C. §2000e-5(g)(2)(B).  The court remarked that retaliation claims were noticeably and conspicuously absent from 2000e-2(m).  Moreover, "the statutory provision immediately preceding [the mixed motives remedies provision] makes explicit reference to retaliation claims."  McNutt v. Board of Trustees of the Univ. of Ill., 141 F.3d at 709 (referring to 42 U.S.C. §2000e-5(g)(2)(A)).  The omission of retaliation in the very next section therefore took on "special significance."  Id.  The court noted that it was not its role to "question these kinds of seemingly inexplicable legislative choices where they are spelled out in plain statutory language."  Id.  See Speedy v. Rexnord Corp., 243 F.3d 397, 401 (7th Cir. 2001)(reaffirming its holding in McNutt).

The other circuits that have considered this issue have agreed with the Seventh Circuit.  See Tance v. Nordberg, 98 F3d. 680, 684 (1st Cir. 1996)(holding that the 1991 Civil Rights Act does not apply to retaliation claims and that the Price Waterhouse "mixed motive" standard is still applicable); Woodson v. Scott Paper Co., 109 F.3d 913, 935 (3d. Cir. 1997).  See also Cosgrove v. Sears,

Roebuck & Co., 9 F.3d 1033, 1040 (2d Cir. 1993)(applying a standard mixed-motive analysis as derived from Price Waterhouse without considering how the CRA of 1991 might have affected the application of Price Waterhouse to retaliation cases).  See also Debra S. Katz and Alan R. Kabat, "Retaliation in the Workplace," ALI-ABA Course of Study at *5 (December 5-7, 2002)("[T]he federal appellate courts have consistently held that this statutory 'mixed motive' element is not available for retaliation claims, since the statute does not include retaliation for engaging in protected conduct in its listing of five categories of protected status.").  Other district courts have come to the same conclusion.  See, e.g., Riess v. Dalton, 845 F. Supp. 742, 744-45 (S.D. Cal. 1993)(holding that the Civil Rights Act of 1991 does not alter the Price Waterhouse "mixed motive" standard for retaliation claims because Congress did not explicitly reference retaliation).

In Medlock v. Ortho Biotech, Inc., 164 F.3d 545 (10th Cir. 1999), the jury found that the employer would not have discharged the plaintiff but for its retaliatory motive.  See id. at 550.  The defendant in Medlock moved for judgment notwithstanding the jury's verdict; one reason for this motion was the defendant's contention that the court erred in its jury instructions because it included a "motivating factor" instruction and that language -- from § 2000e-2(m) -- was inapplicable in retaliation cases.  The district court disagreed and held that § 2000e-2(m) applies to retaliation cases although the language of that section does not specifically mention the word "retaliation."  See Medlock v. Johnson & Johnson Cos., 1996 WL 707029, * 3 (D. Kan. 1996).  On appeal, the Tenth Circuit determined that, because the jury found that the defendant would not have discharged the plaintiff but for its retaliatory motive, the appellate court did not have to decide whether the 1991 CRA applied to retaliation claims and declined to specifically rule on that issue.  See id. at 552 n.4.  The Tenth Circuit noted, however, the Seventh Circuit's decision in McNutt, the similar holding of

34

the First Circuit in <u>Tanca v. Nordberg,</u> and the opinion in <u>Woodson v. Scott Paper Co.</u>  164 F.3d at 552 n. 4.

The appropriate test is the "but for" test that the United States Court of Appeals for the Fifth Circuit articulated in <u>McDaniel v. Temple Indep. Sch. Dist.,</u> 770 F.2d 1340 (5th Cir. 1985).  In other words, the Court must determine whether there is a genuine issue of material fact whether Sandia would have failed to promote "but for" the retaliatory motive.  <u>See id.</u> at 1346 ("In a retaliation case . . . the ultimate determination is whether or not retaliation for filing a charge under Title VII was a 'but for' cause of the adverse employment decision . . . .  Whether or not there were other reasons for the employer's action, the employee will prevail only by proving that 'but for' the protected activity she would not have been subjected to the action of which she claims.")(internal quotation marks and citation omitted).  The parties have also agreed that this is the appropriate test.  <u>See</u> Transcript of Hearing at 19, line 21 to 20, line 2; 36, line 17 to 37, line 7.

The Tenth Circuit in <u>Wells v. Colorado Dep't of Transp.</u> did not indicate whether any reason being wrong is enough.  If the Court employs in its causal casual connection analysis the <u>Price Waterhouse</u> test used in pretext analysis, there is no protection when there are other, valid reasons for the failure to promote.

**D.    THERE IS NO EVIDENCE IN THIS CASE THAT RAISES ISSUES OF GENUINE FACT WHETHER SANDIA ACTED CONTRARY TO A WRITTEN COMPANY POLICY IN NOT PROMOTING PADILLA-OWENS TO THE SMLS LEVEL.**

Padilla-Owens contends that the documents related to advancement of Sandia's employees through the IJS structure represents classification based upon the work the employee is doing at the time.  The IJS structure is a written document that informs Sandia's management whether an

employee deserves an advancement.  Padilla-Owens understood that an employee had to meet all the level criteria listed on the IJS structure before Sandia could promote her to the next level on the IJS ladder.

Again, Padilla-Owens' argument is based on her reading of the evidence in this matter.  As the Court has already noted, Padilla-Owens had not met all the criteria listed on the document for advancement to SMLS.  While Sandia did not promote Padilla-Owens, she has not shown that such conduct represents Sandia's violation of its written policies.  Padilla-Owens has not made a sufficient showing, under Kendricks v. Penske Transp. Servs., to merit a trial by jury.

### E.   THERE IS NO LEGALLY SIGNIFICANT EVIDENCE OF CAUSAL CONNECTION.

Given the Tenth Circuit's opinion in Adams v. Washburn University of Topeka requires more than the "mere existence of scintilla of evidence" to create a factual dispute,  inaccuracies on some of the specific reasons given do not suggest retaliation.  While the Tenth Circuit has expanded the universe of "other evidence" that a plaintiff can use to show a causal connection, Padilla-Owens' claimed adverse treatment is, at most, a continuation of underlying conduct opposed by her since before she engaged in protected activity.  While there might be a factual issue whether Wells changed her reasons before Padilla-Owens filed her EEO complaint, Padilla-Owens does not show that Wells changed her reasons after Padilla-Owens filed her EEO complaint.  Padilla-Owens does not point to evidence that Sandia/Wells treated her differently than they would have if she had not engaged in protected activity.   The Court cannot reasonably infer a causal connection between the EEO complaint in February 2000 and the failure to promote in July 2000 from the facts presented.  Padilla-Owens has not raised a genuine issue of material fact that there is a causal connection between the

former and the latter.  These inconsistencies that Padilla-Owens points to, and perhaps others, do not provide the "other evidence" to establish causal connection.  The assignment of new tasks after the EEO complaint suggests the opposite.  And Wells' confusion over the level of Padilla-Owens' conference planning activities is insignificant -- at most a scintilla -- in comparison to the undisputed fact that she was not qualified for other reasons.

### F.   PADILLA-OWEN DOES NOT SUFFICIENTLY DISPUTE THAT SHE WAS NOT QUALIFIED.

Finally, and more significantly, if the Court uses the umbrella reason of "not qualified" rather than breaking that rationale down into subpoints, the bottom line is that Wells did not consider Padilla-Owens qualified before the EEO complaint or after it, and there is undisputed evidence in the record that she was not qualified.  The Court cannot infer from the fact that Wells may have been inaccurate on some details of Padilla-Owens' qualifications that the overall reason -- she was not qualified -- is pretextual and provides the "other evidence" needed to establish a causal connection. A mistaken belief can be a legitimate reason for an employment decision.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231.

The Court does not read Wells v. Colorado Dep't of Transp. as saying that, if the Court finds an issue of fact on causal connection -- even by using evidence of pretext to do so -- there is automatically an issue of fact on pretext.  The pretext stage is a different stage.  Also, while overall Padilla-Owens was not qualified, even if the Court were to consider each separate reason she was not qualified, the Price Waterhouse test indicates that Padilla-Owens would not be able to prove that, but for a retaliatory motive, she would have been promoted.

III.   **PADILLA-OWENS CANNOT MEET HER BURDEN TO SHOW THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING PRETEXT.**

Padilla-Owens has not met her burden to establish a causal connection between her EEO complaint and Sandia's failure to promote her to SMLS.   Summary judgment is appropriate. Because, however, as noted earlier, the evidence for causal connection and pretext may be the same, the Court will also consider whether Padilla-Owens has raised a factual question whether Sandia's proffered nondiscriminatory reasons for failing to promote her are pretextual.

A.   **SANDIA HAS OFFERED A NONDISCRIMINATORY REASON FOR NOT PROMOTING PADILLA-OWENS.**

The next level of analysis requires the employer to posit a "legitimate, non-discriminatory business reason" for its employment decision -- in this case the decision not to promote Padilla-Owens.  Peterson v. Utah Dep't of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002); Pastran v. K-Mart Corp., 210 F.3d at 1206.  Where the defendant comes forth with a legitimate business reason for its employment action, the plaintiff then bears the burden of showing that the defendant's proffered reason is pretextual.   See id.  Courts have granted summary judgment where a plaintiff cannot show that the proffered reason for the employment action at issue was a pretext for discrimination.   See Murray v. City of Sapulpa, 45 F.3d 1417, 1422-23 (10th Cir. 1995)(affirming summary judgment where conclusory affidavits and evidence of dissimilar disciplinary treatment held insufficient to support inference of discrimination); Arzate v. City of Topeka, 884 F. Supp. 1494, 1501 (D. Kan. 1995) ("[I]t is well settled that the plaintiff's own 'belief' or 'feeling' that he was the victim of disparate treatment is insufficient, standing alone, to preclude judgment as a matter of law.").   To be retaliatory, the motivating factor for the adverse employment action must be the exercise of the employee's statutory rights; otherwise, the adverse action is not unlawful.   See Marx

38

v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir.) (FLSA retaliation claim), cert. denied, 518 U.S. 1019 (1996).

Sandia has offered one or more legitimate, nondiscriminatory reasons for not promoting Padilla-Owens.   Sandia argues that it required Padilla-Owens to fulfill certain criteria before advancing to an SMLS.  While the reason that Sandia presents can be divided into or seen as many separate specific reasons, Sandia essentially presents one reason to the Court for its failure to promote -- Padilla-Owens did not meet the requirements of an SMLS level employee.   See Sandia's Supporting Memo. at 17.

Wells communicated to Padilla-Owens the requirements needed to advance to an SMLS classification, which included more accountability, more interface outside the immediate peer group, more teaching, the need to make independent decisions, and to perform more instructional design work rather than conference work.  Wells then guided Padilla-Owens away from certain development courses not related to the CTD and recommended alternative courses for her to take.  The burden has shifted to Padilla-Owens to prove that Sandia's reasons for not promoting her are a pretext for retaliation.

### B.   LAW ON PRETEXT

When assessing a contention of pretext, the Court must examine the facts "as they appear to the person making the decision to [take the adverse action against the] plaintiff."  Kendrick v. Penske Transp. Servs. Inc., 220 F.3d at 1231.  See Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209 (10th Cir. 1999)(noting that it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of her performance, that is relevant in determining pretext).  The Court may not second guess the employer's business judgment.  See Selenke v. Medical Imaging of

39

Colo., 248 F.3d 1249, 1260-61 (10th Cir. 2001) (affirming entry of summary judgment for employer and finding that proffered reason for termination was not pretext for disability discrimination); Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir.)(noting that the court's role is to "prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments"), cert. denied, 528 U.S. 815 (1999); Martinez v. Henderson, 2002 WL 32065672, *15 (D.N.M. 2002)(Smith, M.J.)(same proposition; granting summary judgment to employer).

"A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Anderson v. Coors Brewing Co., 181 F.3d at 1179 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)); Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999). A plaintiff typically shows pretext in one of three ways: (i) evidence that the defendant's stated reason for the employment action was false; (ii) evidence that the defendant acted contrary to a written company policy proscribing the action, under the circumstances, that the defendant took; or (iii) evidence that the defendant acted contrary to an unwritten policy or to a company practice when making the adverse employment decision. See Kendrick v. Penske Transp. Servs., 220 F.3d at 1230.

Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment. See Richmond v. ONEOK, Inc., 120 F.3d at 209; Pastran, 210 F.3d at 1206. A plaintiff withstands a motion for summary judgment and is entitled to a trial if she presents evidence that the defendant's proffered reason is unworthy of belief. See Kendrick, 220 F.3d at 1230; Randle v. City

of Aurora, 69 F.3d 441, 451 (10th cir. 1995).

In Anderson v. Coors Brewing Co., the plaintiff argued "that a genuine issue of material fact existed as to whether she was qualified for the position, thus, a fact issue exists as to whether Defendant's proffered reasoning for terminating her was pretextual." 181 F.3d at 1179. The Tenth Circuit rejected this argument. The Honorable Bobby Baldock, Circuit Judge, stated the record showed "that Plaintiff cannot perform the essential functions of her job and is, therefore, not qualified." Id. (emphasis added). The court said that the plaintiff had not shown the something more, and said the plaintiff was once again "left with the temporal proximity between filing her EEOC complaint" and the adverse action. Id. "Assuming the time between Plaintiff's termination and filing her EEOC claim is sufficient to survive summary judgment in regard to establishing a prima facie case, it cannot overcome Defendant's proffered reason for terminating her." Id. The court said that the plaintiff had not presented any evidence "which would cause a reasonable finder of fact to determine that the reason is unworthy of belief." Id. See Groely v. Shawnee Pub. Sch. Dist. I-93, 1998 WL 852533 at *6 (10th Cir. 1998)(unpublished); Jackson v. Delta Special Schs. Dist. No. 2, 86 F.3d 1489, 1494 (8th Cir. 1996). The plaintiff thus could not show pretext, and the Tenth Circuit affirmed the district court's granting of summary judgment.

In Richmond v. ONEOK, Inc., the plaintiff argued that the employer's proffered reason was "pretextual because she did not receive any 'documented counseling' regarding her poor performance pursuant to the handbook." Id. at 209. The Tenth Circuit rejected that argument: "The mere fact that each incident of deficient work was not 'documented' does not address the inherent performances issues." Id. at 209-10. Again, the court found that the plaintiff had failed to show that the employer's proffered reason for the adverse action was one which a rational jury could find

41

"unworthy of credence."  Id. at 210 (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

### C.     PADILLA-OWENS' PERCEPTIONS ARE NOT THE TEST.

Padilla-Owens perceived these actions, as well as her satisfactory rating, as retaliatory and has testified that she does not believe that training skills are any different from setting up conferences. It is, however, Wells' perception of Padilla-Owens' qualifications that is at issue, and this perception essentially was the same both before and after Padilla-Owens' complaints to Sandia's internal EEO and to the EEOC.  Wells' ongoing attempts to guide Padilla-Owens to fulfill the requirements outlined for advancement to an SMLS is not pretext for retaliation.

Any inconsistencies do not, by themselves, give rise to an issue of fact allowing an inference that, but for a retaliatory motive, Padilla-Owens would have been promoted.  Padilla-Owens has not, based on these inconsistencies, established that Sandia's overall proffered reason -- that she was not qualified -- is "unworthy of belief."

The Court does not believe that whatever outstanding genuine issues of fact remain in this matter foreclose a grant of summary judgment under rule 56 of the Federal Rules of Civil Procedure and the case law interpreting this rule of civil procedure.  The remaining fact determinations do not need to go to the decision-making realm of a jury.  And on the facts that are not in dispute, Sandia is entitled to summary judgment as a matter of law.

### D.     PADILLA-OWENS CANNOT MEET THE "BUT FOR" TEST.

To meet the "but for" test, Padilla-Owens must show that, but for a retaliatory motive, Wells would have promoted her on July 11, 2000, the asserted date of the adverse action.  Padilla-Owens cannot meet this burden.

42

If the Court uses the <u>Price Waterhouse</u> test, there is no pretext.  If the Court, more simply, uses the umbrella reason of "not qualified" rather than breaking that rationale down into subpoints, the bottom line is that Wells did not consider Padilla-Owens qualified after she filed the EEO complaint.  And there is undisputed evidence in the record that she was not qualified.  The court cannot infer from the fact that Wells may have been inaccurate on some details of Padilla-Owens' qualifications that the overall reason -- she was not qualified -- is a pretext.

### E.    PADILLA-OWENS HAS NOT TENDERED EVIDENCE SUFFICIENT TO MEET HER BURDEN TO DEMONSTRATE PRETEXT

Even if the Court were not to employ a "but for" test, Padilla-Owens does not satisfy the traditional tests for creating a genuine issue of material fact.  In her Response, Padilla-Owens argues that Wells' stated reasons for not meeting all SMLS level criteria were "false," pointing to Padilla-Owens' PMFs.  As explained, earlier, this assertion amounts to no more than a disagreement between Padilla-Owens and Wells as to the scope of Padilla-Owens qualifications.  The Court's job is not to independently evaluate Wells' business judgment, but is to determine whether Wells' assessment of Padilla-Owens' credentials raises an inference of retaliation.  Based on the evidence that Padilla-Owens proffers in her Response of SMLS-assignments, Wells' assessment of Padilla-Owens' credentials does not raise an inference of retaliation.

Moreover, Padilla-Owens does not address anything more than three criteria that Sandia contends were not met and that she contends were.  As pointed out above, Wells also felt Padilla-Owens did not meet Criterion No. 16 and only partially met Criteria Nos. 2, 6, 10, and 17.  Assuming, without deciding, that Padilla-Owens' characterization of her qualifications is accurate, Padilla-Owens has failed to proffer evidence demonstrating that she consistently performed at the SMLS level in all

criteria that the written IJS job structures required for promotion.  In sum, Padilla-Owens has not raised a genuine issue as to pretext.  And because she has not met her burden of proof, Sandia is entitled to summary judgment.

**IV.     THE RECORD AS A WHOLE DOES NOT SUPPORT AN INFERENCE OF RETALIATION.**

Finally, while the law has not moved as far as Judge Hartz suggests it should in his separate opinion in <u>Wells v. Colorado Dep't. of Transp</u>., if the Court focuses its attention on whether the total record evidence supports a finding of unlawful retaliation rather than on the isolated components of the <u>McDonnell Douglas</u> framework, the Court is convinced that no reasonable jury could infer retaliation from the evidence presented.

**WHEREFORE, IT IS ORDERED** that the Defendant's Motion for Summary Judgment is granted and the Plaintiff's case against Defendant Sandia Corporation is dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Michael E. Mozes
LAW OFFICES OF MICHAEL E. MOZES, P.C.
Albuquerque, New Mexico

    *Attorney for Plaintiff*


Carol Lisa Smith
Sarah K. Downey
BANNERMAN & WILLIAMS, P.A.
Albuquerque, New Mexico

Marianne B. Hill
SANDIA NATIONAL LABORATORIES
Albuquerque, New Mexico

    *Attorneys for Defendant*